# Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriation

If, after the expiration of an agency's appropriation, Congress has not enacted an appropriation for the immediately subsequent period, the agency may obligate no further funds except as necessary to bring about the orderly termination of its functions, and the obligation or expenditure of funds for any purpose not otherwise authorized by law would be a violation of the Antideficiency Act.

The manifest purpose of the Antideficiency Act is to insure that Congress will determine for what purpose the government's money is to be spent and how much for each purpose.

Because no statute generally permits federal agencies to incur obligations without appropriations for the pay of employees, agencies are not, in general, authorized to employ the services of their employees upon a lapse in appropriations.

April 25, 1980

THE PRESIDENT

MY DEAR MR. PRESIDENT: You have requested my opinion whether an agency can lawfully permit its employees to continue work after the expiration of the agency's appropriation for the prior fiscal year and prior to any appropriation for the current fiscal year. The Comptroller General, in a March 3, 1980, opinion, concluded that, under the so-called Antideficiency Act, 31 U.S.C. § 665(a), any supervisory officer or employee, including the head of an agency, who directs or permits agency employees to work during any period for which Congress has not enacted an appropriation for the pay of those employees, violates the Antideficiency Act. Notwithstanding that conclusion, the Comptroller General also took the position that Congress, in enacting the Antideficiency Act, did not intend federal agencies to be closed during periods of lapsed appropriations. In my view, these conclusions are inconsistent. It is my opinion that, during periods of "lapsed appropriations," no funds may be expended except as necessary to bring about the orderly termination of an agency's functions, and that the obligation or expenditure of funds for any purpose not otherwise authorized by law would be a violation of the Antideficiency Act.

Section 665(a) of Title 31 forbids any officer or employee of the United States to:

> Involve the Government in any contract or other obligation, for the payment of money for any purpose, in

16

advance of appropriations made for such purpose, unless such contract or obligation is authorized by law.

Because no statute permits federal agencies to incur obligations to pay employees without an appropriation for that purpose, the "authorized by law" exception to the otherwise blanket prohibition of § 665(a) would not apply to such obligations.[1] On its face, the plain and unambiguous language of the Antideficiency Act prohibits an agency from incurring pay obligations once its authority to expend appropriations lapses.

The legislative history of the Antideficiency Act is fully consistent with its language. Since Congress, in 1870, first enacted a statutory prohibition against agencies incurring obligations in excess of appropriations, it has amended the Antideficiency Act seven times.[2] On each occasion, it has left the original prohibition untouched or reenacted the prohibition in substantially the same language. With each amendment, Congress has tried more effectively to prohibit deficiency spending by requiring, and then requiring more stringently, that agencies apportion their spending throughout the fiscal year. Significantly, although Congress, from 1905 to 1950, permitted agency heads to waive their agencies' apportionments administratively, Congress never permitted an administrative waiver of the prohibition against incurring obligations in excess or advance of appropriations. Nothing in the debates concerning any of the amendments to or reenactments of the original prohibition has ever suggested an implicit exception to its terms.[3]

The apparent mandate of the Antideficiency Act notwithstanding, at least some federal agencies, on seven occasions during the last 30 years, have faced a period of lapsed appropriations. Three such lapses occurred in 1952, 1954, and 1956.[4] On two of these occasions, Congress subsequently enacted provisions ratifying interim obligations incurred during the lapse.[5] However, the legislative history of these provisions

---

[1] An example of a statute that would permit the incurring of obligations in excess of appropriations is 41 U.S.C. § 11, permitting such contracts for "clothing, subsistence, forage, fuel, quarters, transportation, or medical and hospital supplies" for the Armed Forces. See 15 Op. Att'y Gen. 209. See also 25 U.S.C § 99 and 31 U.S.C. § 668.

[2] Act of March 3, 1905, ch. 1484, § 4, 33 Stat. 1257; Act of Feb. 27, 1906, ch. 510, § 3, 34 Stat. 48; Act of Sept. 6, 1950, ch. 896, § 1211, 64 Stat. 765; Pub. L. 85-170, § 1401, 71 Stat. 440 (1957); Pub. L. 93-198, § 421, 87 Stat. 789 (1973); Pub. L. 93-344, § 1002, 88 Stat. 332 (1974); Pub. L. 93-618, § 175(a)(2), 88 Stat. 2011 (1975).

[3] The prohibition against incurring obligations in excess of appropriations was enacted in 1870, amended slightly in 1905 and 1906, and reenacted in its modern version in 1950. The relevant legislative debates occur at Cong. Globe, 41st Cong., 2d Sess. 1553, 3331 (1870); 39 Cong. Rec. 3687-692, 3780-783 (1905); 40 Cong. Rec. 1272-298, 1623-624 (1906); 96 Cong. Rec. 6725-731, 6835-837, 11369-370 (1950).

[4] In 1954 and 1956, Congress enacted temporary appropriations measures later than July 1, the start of fiscal years 1955 and 1957. Act of July 6, 1954, ch. 460, 68 Stat. 448; Act of July 3, 1956, ch. 516, 70 Stat. 496. In 1952, Congress enacted, two weeks late, supplemental appropriations for fiscal year 1953 without having previously enacted a temporary appropriations measure. Act of July 15, 1952, ch. 758, 66 Stat. 637.

[5] Act of July 15, 1952, ch. 758, § 1414, 66 Stat. 661; Act of Aug. 26, 1954, ch. 935, § 1313, 68 Stat. 831.

17

does not explain Congress' understanding of the effect of the Antideficiency Act on the agencies that lacked timely appropriations.[6] Neither are we aware that the Executive Branch formally addressed the Antideficiency Act problem on any of these occasions.

The four more recent lapses include each of the last four fiscal years, from fiscal year 1977 to fiscal year 1980. Since Congress adopted a fiscal year calendar running from October 1 to September 30 of the following year, it has never enacted continuing appropriations for all agencies on or before October 1 of the new fiscal year.[7] Various agencies of the Executive Branch and the General Accounting Office have internally considered the resulting problems within the context of their budgeting and accounting functions. Your request for my opinion, however, apparently represents the first instance in which this Department has been asked formally to address the problem as a matter of law.

I understand that, for the last several years, the Office of Management and Budget (OMB) and the General Accounting Office (GAO) have adopted essentially similar approaches to the administrative problems posed by the Antideficiency Act. During lapses in appropriations during this Administration, OMB has advised affected agencies that they may not incur any "controllable obligations" or make expenditures against appropriations for the following fiscal year until such appropriations are enacted by Congress. Agencies have thus been advised to avoid hiring, grantmaking, nonemergency travel, and other nonessential obligations.

When the General Accounting Office suffered a lapse in its own appropriations last October, the Director of General Services and Controller issued a memorandum, referred to in the Comptroller General's opinion,[8] indicating that GAO would need "to restrain our FY 1980 obligations to only those essential to maintain day-to-day operations." Employees could continue to work, however, because of the Director's determination that it was not "the intent of Congress that GAO close down."

---

[6] In 1952, no temporary appropriations were enacted for fiscal year 1953. The supplemental appropriations measure enacted on July 15, 1952 did, however, include a provision ratifying obligations incurred on or since July 1, 1952. Act of July 15, 1952, ch. 758, § 1414, 66 Stat. 661. The ratification was included, without elaboration, in the House Committee-reported bill, H. Rep. No. 2316, 82d Cong., 2d Sess. 69 (1952), and was not debated on the floor.

In 1954, a temporary appropriations measure for fiscal year 1955 was presented to the President on July 2 and signed on July 6. Act of July 6, 1954, ch. 460, 68 Stat. 448. The Senate Committee on Appropriations subsequently introduced a floor amendment to the eventual supplemental appropriations measure that ratified obligations incurred on or after July 1, 1954, and was accepted without debate. Act of Aug. 26, 1954, ch. 935, § 1313, 68 Stat. 831. 100 Cong. Rec. 13065 (1954).

In 1956, Congress' temporary appropriations measure was passed on July 2 and approved on July 3. Act of July 3, 1956, ch. 516, 70 Stat. 496. No ratification measure for post-July 1 obligations was enacted.

[7] Pub. L. 94–473, 90 Stat. 2065 (Oct. 11, 1976); Pub. L. 95–130, 91 Stat. 1153 (Oct. 13, 1977); Pub. L. 95–482, 92 Stat. 1603 (Oct. 18, 1978); Pub. L. 96–86, 93 Stat. 656 (Oct. 12, 1979).

[8] The entire memorandum appears at 125 Cong. Rec. S13784 (daily ed. Oct. 1, 1979) [remarks of Sen. Magnuson].

18

In my view, these approaches are legally insupportable. My judgment is based chiefly on three considerations.

First, as a matter of logic, any "rule of thumb" excepting employee pay obligations from the Antideficiency Act would have to rest on a conclusion, like that of the Comptroller General, that such obligations are unlawful, but also authorized. I believe, however, that legal authority for continued operations either exists or it does not. If an agency may infer, as a matter of law, that Congress has authorized it to operate in the absence of appropriations, then in permitting the agency to operate, the agency's supervisory personnel cannot be deemed to violate the Antideficiency Act. Conversely, if the Antideficiency Act makes it unlawful for federal agencies to permit their employees to work during periods of lapsed appropriations, then no legislative authority to keep agencies open in such cases can be inferred, at least from the Antideficiency Act.

Second, as I have already stated, there is nothing in the language of the Antideficiency Act or in its long history from which any exception to its terms during a period of lapsed appropriations may be inferred. Faithful execution of the laws cannot rest on mere speculation that Congress does not want the Executive Branch to carry out Congress' unambiguous mandates.

It has been suggested, in this regard, that legislative intent may be inferred from Congress' practice in each of the last four years of eventually ratifying obligations incurred during periods of lapsed appropriations if otherwise consistent with the eventual appropriations.[9] Putting aside the obvious difficulty of inferring legal authority from expectations as to Congress' future acts, it appears to me that Congress' practice suggests an understanding of the Antideficiency Act consistent with the interpretation I have outlined. If legal authority exists for an agency to incur obligations during periods of lapsed appropriations, Congress would not need to confirm or ratify such obligations. Ratification is not necessary to protect private parties who deal with the government. So long as Congress has waived sovereign immunity with respect to damage claims in contract, 28 U.S.C. §§ 1346, 1491, the *apparent* authority alone of government officers to incur agency obligations would likely be sufficient to create obligations that private parties could enforce in court. The effect of the ratifying provisions seems thus to be limited to providing *legal* authority where there was none before, implying Congress' understanding that agencies are not otherwise empowered to incur obligations in advance of appropriations.

Third, and of equal importance, any implied exception to the plain mandate of the Antideficiency Act would have to rest on a rationale that would undermine the statute. The manifest purpose of the

---

[9] Pub. L. 94–473, § 108, 90 Stat. 2066 (1976); Pub. L. 95–130, § 108, 91 Stat. 1154 (1977); Pub. L. 95–482, § 108, 92 Stat. 1605 (1978); Pub. L. 96–86, § 117, 93 Stat. 662 (1979).

Antideficiency Act is to insure that Congress will determine for what purposes the government's money is to be spent and how much for each purpose. This goal is so elementary to a proper distribution of governmental powers that when the original statutory prohibition against obligations in excess of appropriations was introduced in 1870, the only responsive comment on the floor of the House was, "I believe that is the law of the land now." Cong. Globe, 41st Cong., 2d Sess. 1553 (1870) (remarks of Rep. Dawes).

Having interpreted the Antideficiency Act, I would like to outline briefly the legal ramifications of my interpretation. It follows first of all that, on a lapse in appropriations, federal agencies may incur no obligations that cannot lawfully be funded from prior appropriations unless such obligations are otherwise authorized by law. There are no exceptions to this rule under current law, even where obligations incurred earlier would avoid greater costs to the agencies should appropriations later be enacted.[10]

Second, the Department of Justice will take actions to enforce the criminal provisions of the Act in appropriate cases in the future when violations of the Antideficiency Act are alleged. This does not mean that departments and agencies, upon a lapse in appropriations, will be unable logistically to terminate functions in an orderly way. Because it would be impossible in fact for agency heads to terminate all agency functions without incurring any obligations whatsoever in advance of appropriations, and because statutes that impose duties on government officers implicitly authorize those steps necessary and proper for the performance of those duties, authority may be inferred from the Antideficiency Act itself for federal officers to incur those minimal obligations necessary to closing their agencies. Such limited obligations would fall within the "authorized by law" exception to the terms of § 665(a).

This Department will not undertake investigations and prosecutions of officials who, in the past, may have kept their agencies open in advance of appropriations. Because of the uncertainty among budget and accounting officers as to the proper interpretation of the Act and Congress' subsequent ratifications of past obligations incurred during periods of lapsed appropriations, criminal sanctions would be inappropriate for those actions.

Respectfully,

BENJAMIN R. CIVILETTI

---

[10] See 21 Op. Att'y Gen. 288.